# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROBERT LOVE,

        Plaintiff,

    v.                                    Case No. 05-C-549

BLUE CROSS AND BLUE
SHIELD OF GEORGIA, INC.,

        Defendant.

---

## DECISION AND ORDER

---

Defendant Blue Cross and Blue Shield of Georgia has moved for partial summary judgment,
presenting a choice of law question it deems of crucial importance. Specifically, it contends that
this dispute–which involves the plaintiff's claim of bad faith–should be governed by Georgia law.
In response, the plaintiff argues that Wisconsin law should apply. The result impacts the amount
of damages potentially available should the plaintiff be successful: under Wisconsin law the
plaintiff is entitled to all damages proximately caused by the bad faith, whereas under Georgia law
the amount is capped at the amount of benefits that should have been paid plus the greater of $5,000
or 50% of the amount wrongly withheld.[1] The relevant facts are set forth below.

---

[1] Georgia Code Ann. § 33-4-6(a) provides that "[i]n the event of a loss which is covered by
insurance and the refusal of the insurer to pay the same within 60 days after a demand has been
made by the holder of the policy and a finding has been made that such refusal was in bad faith, the
insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the
liability or $5,000, whichever is greater, and all reasonable attorney fees for the prosecution of the
action against the insurer." Under Wisconsin law, by contrast, an insurer that breaches the duty of
good faith owed to its insured "is liable for any damages which are the proximate result of that
breach." *DeChant v. Monach Life Ins. Co.*, 547 N.W.2d 592, 596 (Wis. 1996).

## I. Background

In 2002, the plaintiff's wife, Joan Nicholls (now deceased), purchased a health insurance policy from Blue Cross and Blue Shield of Georgia. At the time, she was a permanent resident of Georgia. In February 2003, she was diagnosed with cancer and began receiving treatment in Georgia. In June 2003, she moved to Wisconsin and her treatment continued until her death in September 2004. Soon after, the plaintiff filed this lawsuit, alleging that Blue Cross's handling of certain bills Nicholls submitted for the treatment his wife received in Wisconsin was in bad faith.

## II. Analysis

As noted initially, the only question presently before me is the choice between Wisconsin and Georgia law. "Federal courts sitting in diversity apply the choice-of-law rules of the forum state to determine the applicable substantive law." *Hinc v. Lime-O-Sol Co.,* 382 F.3d 716, 719 (7th Cir. 2004). In Wisconsin, courts use two tests to determine which state's law should apply.[2] First, the court "must judge 'whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling.'" *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 677 N.W.2d 298, 307 (Wis. 2004) (quoting *American Standard Ins. Co. v. Cleveland,* 369 N.W.2d 168 (Wis. Ct. App.1985)). By its terms, this is not a pure contacts-balancing test, but an approach that says merely minuscule contacts with another state will not justify the application of that state's law. In other words, it only constitutes "officious

---

[2]The preferred approach in Wisconsin remains somewhat unclear, however. *See Drinkwater v. American Family Mut. Ins. Co.*, 714 N.W.2d 568, 576 (Wis. 2006).

intermeddling" if the other state is truly of remote connection to the issues in the case.[3]  The second

approach involves consideration of the following five factors: (1) predictability of results; (2)

maintenance of interstate and international order; (3) simplification of the judicial task; (4)

advancement of the forum's governmental interests; and (5) application of the better rule of law.

*Id.*

Applying the threshhold test, I am unable to conclude that it would be "officious

intermeddling" to apply Georgia law to this case. Georgia's relationship to the plaintiff and the

insured was not a matter of mere happenstance; instead, Nicholls applied for and was issued an

insurance policy from Blue Cross and Blue Shield of Georgia.  She lived in the state at the time,

bought a policy that said Georgia law would apply, and could only expect that the state's insurance

law might have some impact on any claim she might have against her insurer.  In contrast, in *Beloit*

*Liquidating Trust,* the Wisconsin Supreme Court noted that Delaware was only a potential source

of state law because the corporation had been incorporated there.  Apart from that distant connection

to Delaware, there was no legitimate reason to apply Delaware law, especially considering the

company had operated in Wisconsin for 140 years.  Thus, the court concluded that the company's

contacts with Delaware were "isolated." *Id.*  Because Nicholls' contacts with Georgia were not so

isolated, I cannot conclude that the application of Georgia law would result in officious

intermeddling.

Turning to the second approach, I must consider the five factors Wisconsin courts apply.

In contrast to *Beloit Liquidating Trust,* however, where the court's discussion of the five factors was

---

[3]Wisconsin courts have sometimes described the question as whether it would be "completely absurd" to apply the other state's law given the state's limited connection to the case. *Hunker v. Royal Indem. Co.,* 204 N.W.2d 897, 900 (Wis. 1973).

colored by its earlier conclusion that Delaware had only a minimal connection to the facts, I begin with something of a blank slate because both Wisconsin and Georgia have significant and meaningful relationships with the insured and the insurance policy in question.

The first factor involves predictability of results. The plaintiff argues that Blue Cross is a corporation placed on notice by Wis. Stat. § 180.1704 that if it chooses to transact business in Wisconsin it will be subject to Wisconsin law. That statute, part of Wisconsin's corporate law, states that "this chapter applies to all foreign corporations transacting business in this state on or after January 1, 1991." Wis. Stat. § 180.1704. In *Beloit Liquidating Trust,* the court found that the statute meant that "Wisconsin law should be applied in determining whether the directors or offices breached their fiduciary duty to Beloit Corporation's creditors." 677 N.W.2d at 307. Yet the fact that Wisconsin's law of corporations should be applied to a foreign corporation on a matter of corporate law (breach of fiduciary duty) is far different from concluding that *all* of Wisconsin's laws automatically govern interstate disputes. Indeed, if that were true there would be no need for a choice-of-law analysis whenever a foreign corporation was involved. There is thus no basis for finding that § 180.1704 would apply to a bad faith insurance dispute like this one.

Moreover, the statute only applies to corporations "transacting business in Wisconsin," and there is little reason to conclude that Blue Cross and Blue Shield of Georgia transacted business here merely because Nicholls moved to the state and received treatment. Thus, it is not as though the defendant willingly availed itself of Wisconsin business and now seeks the protections of its home state law. Accordingly, I find little basis to conclude that application of Wis. Stat. § 180.1704 is warranted under these facts.

4

It is, in fact, doubtful that the result would become more predictable if the substantive law of insurance were dependent simply on where an insured chose to move. Of course no one expects ill insureds to move to a new state based on the damages the state offers in bad faith lawsuits against insurers, and the defendant does not suggest any hint of forum shopping. Yet leaving the applicable law so open-ended and contingent promotes confusion, not predictability, in the law. Thus, I conclude that predictability of results is fostered when a state's substantive law applies to a policy issued in that state by a state corporation to a resident of that state, especially when, as here, the policy in question explicitly states that Georgia law should apply.[4]

The Wisconsin Supreme Court would seem to agree with this approach. In a case involving a car accident in Canada, the court set forth its analysis as follows:

> The first factor, predictability of results, deals with the parties' expectations. The question here is what legal consequence of the Manitoba accident comports with the predictions or expectations of the parties? *The present case involves a dispute between Wisconsin residents and a Wisconsin insurance company about a policy issued in Wisconsin. It is reasonable to assume that the parties involved in the insurance transaction expected that Wisconsin law would be applicable to claims under the policy.* Applying Wisconsin law to the type of damages recoverable in the present case promotes uniformity of interpretation of an insurance policy regardless of the jurisdiction in which the injury occurs. *The parties will know at the time a policy is issued what benefits are available.*

*State Farm Mut. Auto. Ins. Co. v. Gillette,* 2002 WI 31, 641 N.W.2d 662, 676 (Wis. 2002) (italics added). Although the present dispute is one step removed from *Gillette*–because the deceased became a Wisconsin resident after the policy was issued–the same considerations still apply. In

---

[4]There was a time when a choice of law provision in a contract would be given almost conclusive effect. *See In re Knippel's Estate*, 96 N.W. 514, 517 (Wis. 1959) ("With respect to various other types of contract, this court has held that the choice of law governing validity and interpretation is basically a question of the intention of the parties except where their intention is to commit a fraud on the law."); *see also* Restatement (Second) Conflict of Laws § 187. It is clear from *Drinkwater*, however, that this is no longer the law in Wisconsin.

5

each case, the parties will know from the outset which state's law will govern their insurance claims. Although it is fanciful to believe the typical insured considers such things when purchasing insurance, insurance companies certainly may factor state law considerations into their policies and into the premiums they charge: a policy issued in Georgia to Georgia residents might well cost less because of the damage caps the state legislature has put in place. Moreover, in such circumstances plaintiffs are not without protection from arbitrariness: in the event the state of contracting was truly of limited relation to the insureds, a Wisconsin court might decline, citing "officious intermeddling," to apply that state's law. Other aspects of the five-part test may also apply. On balance, however, the first factor favors application of the law of the state in which the insured and insurer agreed on the policy.[5]

The second factor relates to the maintenance of international and interstate order. "This factor requires that a jurisdiction which is minimally concerned defer to a jurisdiction that is substantially concerned." *Drinkwater,* 714 N.W.2d at 577. As noted earlier, neither jurisdiction is "minimally concerned" here, so the factor is a wash. Application of one state's law over another's would not upset interstate order, and there is no indication of forum shopping. *See id.*

The third factor involves the simplification of the judicial task. Wisconsin courts have noted that there is a presumption (not surprisingly) that the judicial task is simplified by applying Wisconsin law. The presumption cannot be too strong, however, or else the entire choice-of-law exercise is merely academic: it would always be easier to let the home team win. Moreover,

---

[5]Because each case is fact-specific, the efficacy of considering the "predictability of results" in retrospect seems somewhat limited. Moreover, predictability is itself only one of five factors courts consider. Thus, the choice-of-law analysis is itself inherently unpredictable because it is dependent on so many other factors. Because of this inherent *un*predictability, one may reasonably question how much weight Wisconsin courts actually place on predictability of results.

because federal courts tend to have more experience applying foreign law due to their role sitting in diversity cases like this one, it is unclear to what extent the assumptions underlying the Wisconsin courts' presumptions should be applied. In any event, I conclude that under these facts the judicial task is not simplified by applying one state's law over another's. The salient difference in the two states' laws relates only to the damages available in a bad faith lawsuit, and it is doubtful that one law is more easily applied than another. *See Gillette,* 641 N.W. 2d at 667 ("A Wisconsin court can easily and simply apply Manitoba law to determine damages in the present case. Manitoba law does not complicate the task of Wisconsin judges. Manitoba law simply bars further proceedings on noneconomic damages.") Accordingly, I conclude that the third factor–like the second–is largely a wash.

"The fourth factor is advancement of the forum's governmental interests. Wisconsin has a strong interest in compensating its residents who are victims of torts." *Id.* Relying heavily on *Hunker v. Royal Indem. Co.*, Blue Cross argues that Wisconsin's interest will adequately be served if Georgia law is applied and that the interests of Wisconsin's citizens are minimal. 204 N.W. 897, 908 (Wis. 1973) ("No Wisconsin citizens or Wisconsin interests suffer because damages are not awarded on the full tort basis. No significant interest of the forum is sacrificed by the application of the Ohio law rather than Wisconsin's.") But *Hunker* involved an action involving two Ohio citizens–employees of the same company–arising out of an accident occurring in Wisconsin. The dispute involved the application of Ohio's law barring lawsuits between co-employees. Given that the sole issue in the case was directly related to the employment relationship between two employees of an Ohio company, the court concluded, not surprisingly, that Wisconsin's interests in applying its own law to the matter were relatively minimal. *Id.* at 904-905.

7

Here, Wisconsin's governmental interest is not so minimal. The alleged bad faith only occurred with respect to claims for medical services provided in Wisconsin. Although the processing of the claims occurred in Georgia, those claims are inextricably linked to Wisconsin-provided services–indeed, the claims were submitted first to Blue Cross of Wisconsin, which then transmitted them to Georgia. So it is not the mere happenstance of an auto accident that brings this case to a Wisconsin federal court: instead, the case is brought based on the insurer's treatment of claims for services provided in this state to a state resident.

Wisconsin' s approach to bad faith sharply differs from Georgia's. Wisconsin courts have recognized that bad faith is a tort, the purpose of which is to protect the state's residents and to "redress all economic harm proximately caused by an insurer's bad faith." *DeChant v. Monarch Life Ins. Co.,* 547 N.W.2d 592, 596 (Wis. 1996). "By virtue of the relationship between the parties created by an insurance contract, a special duty arises, the breach of which duty is a tort and is unrelated to contract damages." *DeChant*, 547 N.W.2d at 596. Thus, the damages allowed for the tort include punitive damages and even attorney's fees. *Id*. at 597. The same is true for Georgia. But in Wisconsin, a plaintiff may also recover for emotional distress, loss of reputation, and economic injury. *Id.* at 596. In sharp contrast, Georgia directly links the damages available for bad faith to the benefits wrongly withheld, suggesting that the state views bad faith more under a contract theory than as an independent tort, at least for purposes of calculating damages. In this respect, Georgia's scheme resembles ERISA. *See Senese v. Chicago Area I.B. of T. Pension Fund,* 237 F.3d 819, 825 (7th Cir. 2001). Although it allows a sort of bonus of 50% added on to the value of benefits withheld, the resulting damage award is still dependent on the policy benefits (i.e., the contract) rather than the other damages that might have been proximately caused by the bad faith,

and Wisconsin has rejected that approach. *See DeChant* 547 N.W.2d at 596 (bad faith is "unrelated

to contract damages".) Given this substantial difference in approaches, one must conclude that

Wisconsin would have a strong interest in ensuring that tort victims in this state receive the full

amount of damages provided for under Wisconsin law. In other words, the state has rejected any

limitation on damages tied solely to the amount of benefits withheld.

The defendant maintains that Wisconsin courts will only balk in applying foreign law if the

foreign law completely precludes relief. Here, they note, relief is still available under Georgia law

and the question is simply a matter of the nature of damages available to the plaintiff. But even if

relief is available under Georgia law, the nature of the damages available is fundamentally different.

It is thus doubtful that Wisconsin's "strong interest in compensating its residents who are victims

of torts" would be protected if Georgia's law applied here. *Gillette,* 641 N.W.2d at 667.

In addition, given the State Supreme Court's opinion in *DeChant*, as well as its more recent

pronouncements on liability damage caps, it is abundantly clear that the Wisconsin Supreme Court

views damage caps with a jaundiced eye. In *Ferdon ex rel. Petrucelli v. Wisconsin Patients

Compensation Fund,* 701 N.W.2d 440, 462 (Wis. 2005), for example, one basis the court cited for

throwing out Wisconsin's $350,000 medical malpractice noneconomic damages cap was that the

cap's impact was greatest on those who were the most injured:

> Indeed, the burden of the cap falls entirely on the most seriously injured victims of
> medical malpractice. Those who suffer the most severe injuries will not be fully
> compensated for their noneconomic damages, while those who suffer relatively
> minor injuries with lower noneconomic damages will be fully compensated. The
> greater the injury, the smaller the fraction of noneconomic damages the victim will
> receive.

9

*Id.* at 465. "[W]hen the legislature shifts the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of vulnerable, injured patients, the legislative action does not appear rational." *Id.* at 466. Although the analogy is not perfect, the same considerations apply to this case. Application of any kind of damage cap means that those most harmed by an insurer's bad faith will be among the least compensated (on a percentage basis). Although it is conceivable that the 50% bonus provided by Georgia law could *increase* the damages available in some cases, as a practical matter the restriction on any non-contractual damages would often sharply restrict the damages available to those most afflicted by an insurer's bad faith. It also means that insurers acting in bad faith are insulated from the kinds of damages that other tortfeasors are subject to, and I have little doubt that Wisconsin's public policy, as articulated by its Supreme Court, would disfavor such a result. Thus, based on the fundamental difference between Wisconsin's and Georgia's law of bad faith, as well as the Wisconsin court's general distaste for damages limitations, I conclude that Wisconsin's governmental interest would be advanced significantly by applying Wisconsin's law rather than Georgia's.

Along the same lines, the fifth factor requires a court to consider which is the better rule of law. Of course unelected judges are not equipped to opine on such questions: when the question undoubtedly involves compromises between numerous interested groups, such judgments are best preserved for elected legislators. Thus, this factor does not ask judges to exercise a sort of Solomonic superlegislative judgment about which is the "better rule of law," but instead asks whether the *state* has made such a determination. In that respect, the fifth factor largely echos the fourth. In *Drinkwater,* for example, the court noted:

10

> As previously suggested, we need not and do not necessarily conclude that Iowa law is bad law or serves no legitimate purpose. Yet, this court's repeated affirmations of Wisconsin's made-whole doctrine must to some extent be taken as an indication of Wisconsin's view that our made-whole doctrine constitutes the better rule. This court has rejected the Iowa approach.

714 N.W.2d at 579. In other words, in a case like this in which the forum state has a clear policy, and when the state's law fairly articulates that policy, it follows that the "better rule of law" will tend to be the forum state's law.[6] Because of the considerations noted above, Wisconsin has indicated that the better rule of law is to allow bad faith victims the full panoply of compensatory damages, whether or not they are linked to any benefits provided for in the policy. Accordingly, the fifth factor favors application of Wisconsin's law rather than Georgia's.

Based on the above, only one of the factors–the first–favors Georgia law. Although the predictability of the result would likely be enhanced if there were a strong presumption that the state law selected by the parties should supply the law, I conclude that Wisconsin's strong public policy interests, as set forth in *DeChant* and elsewhere, trump the predictability factor. Wisconsin has indicated its belief that bad faith is a tort for which a wide array of damages are available, and it has a strong interest in ensuring that its residents receive full compensation for such torts. Accordingly, Wisconsin law should apply.

---

[6]Analysis of this factor may vary depending on whether one looks to the view of the Wisconsin legislature or the State's Supreme Court. Although the Supreme Court struck down the State's cap on noneconomic damages in medical malpractice actions in *Ferdon*, the legislature moved quickly to reinstate a cap that it believes the Supreme Court will find acceptable. *See* 2005 Wis. Act 183. But since the role of a federal court sitting in diversity is to follow what it believes the relevant state's supreme court would hold in such a situation, *Miller v. Pardner's Inc.* 893 F.2d 932, 934 (7th Cir. 1990), I look to the rulings of the Wisconsin Supreme Court for guidance.

11

The motion for partial summary judgment is therefore DENIED, and Wisconsin law, rather than Georgia law, applies to the plaintiff's action.

SO ORDERED this   20th   day of June, 2006.


                                        s/ William C. Griesbach
                                        William C. Griesbach
                                        United States District Judge